OPINION OF THE COURT
Louis D. Laurino, S.
This is a case of first impression involving a virtually unregulated business and its impact on the operations of the Surrogate’s Courts and the administration of estates processed through them. This court has observed that over the last few years, on more and more occasions, the parties claiming to be next of kin of one of this county’s decedents have signed contractual agreements with companies commonly referred to as heirs locators.
In the typical scenario, letters of administration will issue to the local Public Administrator in an estate of someone whose next of kin are unknown. When the Public Administrator accounts and the heirs are still unknown, their interests are protected by a court-appointed guardian ad litem and the interests of New York State are protected by the Attorney- *36 General. If no distributees are established the fund will either go to the Finance Administrator for later transmittal to the Comptroller for deposit into the Abandoned Property Fund or will be deposited directly with the Comptroller without the intermediate deposit with the Finance Administrator.
If the parties who claim to be the next of kin appear after final settlement of the Public Administrator’s account, they can begin a proceeding to withdraw the funds from either the Comptroller or Finance Administrator, depending on where the funds were deposited. When the funds on deposit for the unknown kin of a particular decedent are claimed by someone alleging to be a next of kin, very often this claimant was discovered by an heir locating firm, whose involvement in the proceedings is rarely disclosed to the court. In each such case the claimant as well as the heir locators have a significant financial interest in the outcome but the court is usually only aware of the claimant’s. The financial agreement between the heir locators and the alleged kin generally take the form of an assignment of interest sometimes accompanied by a power of attorney, which rarely are recorded in compliance with EPTL 13-2.3 and Uniform Rules for Trial Courts (22 NYCRR) §§ 207.47 and 207.48.
In the case at hand the decedent Alois Kraus died on December 2, 1981, and his estate was administered by the Public Administrator. By decree of this court dated July 28, 1983, the net estate was deposited with the Finance Administrator for the benefit of decedent’s unknown kin. The next and final link in the normal chain of events would have been the transfer of these funds to the Office of the Comptroller of New York for deposit in the Abandoned Property Fund, absent the intervention of someone claiming title to the funds. Prior to the delivery of the funds to the Comptroller, a petition to withdraw the funds on deposit with the Finance Administrator was filed by Alois J. Kraus who alleged himself to be the sole distributee son of the decedent. Proof was submitted to the court and Alois J. Kraus was established as the sole distributee.
At the kinship hearing before a Law Assistant Referee, it was accidentally revealed that Genealogical Research Corp. (G.R.C.) had an agreement with Alois J. Kraus dated July 15, 1987, which provided for 25% of Mr. Kraus’ recovery to go to G.R.C. The agreement contains the following language:
"1. The Owner authorizes GRC to attempt to recover the *37 Assets on behalf of and for the benefit of the Owner; and GRC is authorized to do any and all lawful acts required for said recovery as the Owner could do if acting independently.
"2. The Owner will cooperate fully with GRC in fulfilling the requirements of the recovery, including the execution and delivery of instruments necessary to document the Owner’s claim.
"3. As its compensation, GRC is assigned and shall receive (25%) twenty-five percent of the Assets recovered for the Owner.
"4. Whether or not there is any recovery, GRC shall assume the full amount of all costs and expenses required to effect the recovery of the Owner’s Assets. The Owner shall not be obligated for any costs or expenses, all of which shall be borne by GRC.
"5. This agreement shall be binding on GRC, it successors and assigns, and on the owner’s heirs, successors and assigns, and shall be construed under the laws of the State of New York.”
As a conveyance or assignment by Mr. Kraus of a portion of his interest in his father’s estate, the "agreement” dated July 15, 1987, must be acknowledged and recorded in the Surrogate’s Court pursuant to EPTL 13-2.3 and Uniform Rules for Trial Courts §§ 207.47 and 207.48. The fact that this assignment by Mr. Kraus to G.R.C. was not recorded, deliberately or otherwise, shall not prevent the court from protecting the integrity of its proceedings. In fact EPTL 13-2.3 (a) states: "Every power of attorney relating to an interest in a decedent’s estate and every conveyance or assignment of an interest in an estate, or similar instrument, which contains an express or implied authorization or delegation of power to act thereunder shall be in writing and * * * shall be recorded in the office of the surrogate granting letters in such decedent’s estate * * *. Such recording confers on the surrogate jurisdiction over the grantor of such power of attorney, the attorney in fact therein named and any other person acting thereunder. No attorney in fact named in any power of attorney or in such other instrument nor any person acting thereunder shall perform any act under such instrument unless it has been duly recorded. ” (Emphasis added.)
Uniform Rules for Trial Courts §§ 207.47 and 207.48 set forth the manner in which these assignments of interest and powers of attorney are filed with the court and what docu *38 ments must accompany the instrument. Assignments of interest offered for recording must be accompanied by an affidavit which states whether any power of attorney or separate agreement exists which relates to such assignment or which fixes presently or prospectively the amount payable by or to the assignor (§ 207.47). Further, powers of attorney must be accompanied by an affidavit of the attorney-in-fact stating: the circumstances under which the power was procured; the post-office address of the grantor; the amount of his or her interest and relationship, if any, to decedent; the financial arrangement and exact terms of compensation of the attorney-in-fact or of any other persons concerned with the matter; disbursements to "be charged to the grantor; a copy of any agreement concerning compensation; and the name of any attorney representing the attorney-in-fact (§ 207.48).
Pursuant to SCPA 2112 the court is authorized to fix and determine the compensation, charges and expense of a person acting under a power of attorney or other instrument described in EPTL 13-2.3 for services rendered to the principal and to review and determine the validity and reasonableness of any such compensation, charge or expense, whether or not it has been fixed previously by agreement. By its own motion the court conducted such a hearing which was concluded on March 3, 1989.
Mr. Denis Langel, as president of G.R.C., testified that he became aware of the existence of the funds deposited with the Finance Administrator through examination of public records. This discovery started him on a search for possible heirs of the decedent, which involved further examination of public records, all on Mr. Langel’s own time and at his expense.
In the present case, Mr. Langel located Alois J. Kraus and before identifying the amount or source of the potential recovery, sent Mr. Kraus the agreement which was signed on July 15, 1987. Mr. Langel also testified that any fees for legal services necessary to recover the fund would be absorbed by Mr. Langel from his 25% assignment. Thereafter Mr. Langel recommended Joseph D’Elia, Esq. to Mr. Alois J. Kraus and Mr. D’Elia proceeded to take the steps necessary to prove Mr. Kraus’ entitlement to the fund.
At the hearing on March 3, 1989, Mr. Langel, despite having reviewed his file and having been in the genealogical research business for 18 years, claimed an inability to estimate the numbers of hours spent on the investigative services *39 he performed in this case. When pressed for his best judgment of time spent, Mr. Langel stated he spent 70 hours. In addition Mr. Langel testified that if asked to quote a per hour fee for the services rendered in this type of case, he would charge $150 to $200 per hour, even though Mr. Langel has no standard per hour fee.
In the typical case, an heir locator will have devoted the majority of his time prior to locating the potential client/kin. He will have decided which estate to pursue and will have examined documents and interviewed witnesses and generally satisfied himself that he has found the rightful heir before he presents his offer. Since the kin locator cannot expect the client to pay for the hours already invested when there is no guarantee of success, the arrangement is usually in the form of a contingency fee only if a recovery is made. This court observes that there is no uniformity among these heir locators who will seek anywhere between 10% and 50% as a fee. In short, they seek "whatever the traffic will bear” without any regard to the actual amount of time needed to find the client and have his claim proven.
Mr. Langel stated that his general agreement calls for a 25% payment in cases where he foresees no extreme difficulty. While SCPA 2112 grants this court authority to fix and determine the reasonableness of Mr. Langel’s compensation it will not be necessary to review and pass upon the value of Mr. Langel’s services using the same criteria that are used in fixing compensation generally. This is so because the expressed public policy of the State of New York would void the agreement of July 15, 1987 in its entirety.
Section 1416 of the Abandoned Property Law states:
"1. No agreement to locate property held by the comptroller pursuant to this chapter shall be valid unless that agreement:
"(a) is in writing and signed by the property owner;
"(b) discloses the nature of the property; and
"(c) discloses the name and address of the holder.
"2. No such agreement shall be valid if it provides for payment of a fee in excess of fifteen percent of the value of recoverable property.
"3. Nothing in this section shall be construed to prevent an owner from asserting, at any time, that any agreement to locate property held by the comptroller is based on an excessive or unjust consideration.” (As added by L 1980, ch 173, §1.)
*40 It is conceded that the statute as adopted specifically refers to property on hand with the Comptroller. However, it is an expression of the public policy of this State that agreements calling for recovery of abandoned property are illegal and unenforceable to the extent that the compensation exceeds 15% or if the agreement fails to identify the nature of the asset or its holder. In the case at bar, the funds paid out by the Public Administrator are de facto "abandoned property” whether they are first deposited with the Comptroller or the Finance Administrator. It would be against logic to allow Mr. Langel’s agreement with Mr. Kraus to stand despite the excessive fee, the failure to identify the source of the fund and the failure to identify the holder, merely because the funds had not as yet reached the Comptroller but were still with the Finance Administrator. By law, the funds held by the Finance Administrator were due to be turned over to the Comptroller in a matter of months. There should be no distinction, from the standpoint of the public policy of the State, as to how we treat agreements pertaining to abandoned property held by either the Comptroller or the Finance Administrator.
Pursuant to SCPA 2222 when a person entitled to a legacy or distributive share is unknown, the fiduciary’s accounting decree must provide for direct payment of this amount to Comptroller of the State of New York for the benefit of the person or persons who may thereafter appear to be entitled thereto. In the estate of Alois Kraus, the next of kin were unknown and if this estate were handled by the Public Administrator of any of the counties other than New York City, the net estate would have been deposited directly with the Comptroller.
New York City is unique in that under SCPA 1123 (2) (h) the Public Administrators are authorized to, "Pay or deliver to the Commissioner of finance of the city of New York the balance of any moneys or other assets in his hands remaining after settlement of his account * * * where payable to persons under disability”. (Emphasis added.)
SCPA 103 (40) defines persons under disability as "[a]ny person who is (a) an infant, (b) an incompetent, (c) an incapacitated person, (d) unknown or whose whereabouts are unknown”.
This different treatment of the deposit of shares of unknown distributees of decedents who die residents of New York City as opposed to non-New York City residents is historically *41 based on sections 2740 and 2741 of the old Code of Civil Procedure and section 44 of the State Finance Law of 1909 (see also, Matter of People v Maltbie, 102 Misc 575, affd 184 App Div 743, affd 226 NY 641).
The unknown kin of decedents who die in New York City and whose estates are handled by the local Public Administrator are entitled to the same protections under the law as those unknown kin of decedents who die outside of New York City. To deny application of Abandoned Property Law § 1416 and its protection to persons claiming title to abandoned property held by the Finance Administrator of New York City would be an intolerable discrimination against those persons in favor of persons claiming title to funds initially deposited with the Comptroller.
Accordingly, the agreement between Alois J. Kraus and Genealogical Research Corp. dated July 15, 1987 is deemed unenforceable as a violation of public policy. (Abandoned Property Law § 1416; State of New York v Abandoned Funds Information Center, 129 Misc 2d 614.) The court also notes that by failing to duly record the instrument with the court neither Mr. D’Elia nor Mr. Langel were authorized to perform any acts under such instrument. The instrument was eventually filed with the court as part of the withdrawal proceeding. Failure to file the instrument alone could have resulted in the denial of any payment thereunder.
As to the legal compensation of Joseph D’Elia, no proof was taken at the hearing of March 3, 1989, as to the specific services rendered by him. Mr. D’Elia had a separate agreement with Mr. Langel for a fee of $5,500 to be paid from Mr. Langel’s share of the recovery. The arrangement between Mr. Langel and Mr. D’Elia called for the possibility of seeking further legal fees if additional, unanticipated legal services were required. Since Mr. D’Elia claims such additional services were necessary and would be seeking fees in excess of $5,500 and since Mr. D’Elia was the attorney-in-fact for Alois J. Kraus, it will be necessary for the court to fix his compensation for services rendered at a hearing pursuant to SCPA 2112, which the court sets for June 20, 1989 at 2:00 p.m.
Submit order on notice declaring the agreement of July 15, 1987 between Alois J. Kraus and Genealogical Research Corp. null and void and unenforceable.